## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                  Case No. 20-cr-79 (DWF/TNL)

                Plaintiff,

v.                                                         **REPORT & RECOMMENDATION**

Shawn Ray Brtek (1), and
Erika Laura Camp (2),

                Defendants.

Nathan Hoye Nelson, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government);

Kassius O. Benson, Kassius Benson Law, P.A., 3201 Hennepin Avenue, Minneapolis, MN 55408 (for Defendant Shawn Ray Brtek); and

Andrew S. Garvis, Koch & Garvis, LLC, Lake Calhoun Professional Building, 3109 Hennepin Avenue South, Minneapolis, MN 55408 (for Defendant Erika Laura Camp).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Shawn Ray Brtek's Motion to Suppress Tangible Evidence & Statements Due to Fourth Amendment Violations, ECF No. 33, and Defendant Erika Laura Camp's Motion to Suppress Statements, Admissions and Answers, ECF No. 54, and Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 55. These motions have been referred to the undersigned for a report and recommendation to the district court, the

1

Honorable Donovan W. Frank, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held on November 6, 2020.  ECF No. 74.  Assistant United States Attorney Nathan Hoye Nelson appeared on behalf of the United States of America (the "Government").  Attorney Kassius O. Benson appeared on behalf of Brtek.  Attorney Andrew S. Garvis appeared on behalf of Camp.  Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.

## II. FINDINGS

The Court heard testimony from Officer Jacob Refsland, a licensed peace officer with the Worthington Police Department.  The Government offered and the Court received: Exhibit 1A, video taken from the front of Officer Refsland's squad car; Exhibit 1B, video taken from the rear of Officer Refsland's squad car; Exhibit 2A, video taken from the front of Officer Collin Meinders's squad car; Exhibit 2B, video taken from the rear of Officer Meinders's squad car; Exhibit 3, video from Officer Refsland's body-worn camera; Exhibit 4, video from Officer Meinders's body-worn camera; Exhibit 5, the application, search warrant, and receipt, inventory, and return to search a black GMC Yukon and two cellular phones observed therein; Exhibit 6, an acknowledgement-of-rights form signed by Brtek; Exhibit 7, an acknowledgment-of-rights form signed by Camp; Exhibit 8, an audio recording of the custodial interview of Brtek; and Exhibit 9, an audio recording of the custodial interview of Camp.  Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

2

Officer Refsland has been employed with the Worthington Police Department for approximately five years. Tr. 16:17-23, ECF No. 76.[1]  He has a bachelor's degree in law enforcement. Tr. 16:24-17:2. Officer Refsland's duties include "[r]esponding to calls for service, conducting traffic enforcement, investigating crimes and criminal activity," and engaging in "routine patrol." Tr. 17:3-9. Officer Refsland regularly performs traffic stops in the course of these duties, estimating that he has performed approximately 800 to 900 traffic stops per year over the last five years. Tr. 17:10-18. This volume of traffic stops has provided Officer Refsland the opportunity to "observe the behavior and the demeanor" of the individuals he has stopped. Tr. 17:19-22.

Officer Refsland's duties and training also involve drug interdiction. Tr. 17:23-19:24. As described by Officer Refsland, drug interdiction is "making a lot of different observations, kind of pinpointing vehicles that are potentially involved in criminal activity and occupants that are involved in criminal activity based off of everything that you're observing." Tr. 18:3-7. Officer Refsland has attended multiple training courses on drug interdiction. Tr. 18:13-17. These courses cover topics such as vehicle identification, "signs of deception[,] driving behaviors[,] circumstances that are present around trafficking activities," and the ways "in which traffick[ed] substances are concealed within vehicles." Tr. 19:1-5. Officer Refsland has also been trained on drug identification and has field experience with traffic stops related to drug interdiction. Tr. 19:9-24. Officer Refsland is generally familiar with "major drug distribution hubs in the United States and in the

---

[1] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due November 24, 2020, and no such notice was filed.  ECF No. 76.

Minnesota area." Tr. 19:5-8.

### A. Initial Sighting of Vehicle

Officer Refsland is assigned to work the night shift from 8:30 p.m. until 5:00 a.m. and was working the night shift on April 7, 2020. Tr. 19:25-20:12. On that date, the Stay-at-Home Order imposed by the Governor of the State of Minnesota was in effect. Tr. 20:20-22. Officer Refsland testified that he had noticed that traffic on the roads had "lessened . . . to a degree" under the Stay-at-Home Order. Tr. 20:23-21:3. At the hearing, Officer Refsland testified that he "go[es] out every night in hopes of disrupting criminal activity," and acknowledged that his observations are colored by that view. Tr. 63:4-14; *see* 84:14-21 (general patrol duties include "always looking for signs that might be relevant" to "any criminal activity," including drug trafficking).

On April 7, around 3:20 a.m., Officer Refsland was on patrol "in the area of State Highway 60," which runs through Worthington. Tr. 20:7-19, 56:5-12, 62:22-63:3. Officer Refsland "had been traveling on Highway 60" in the westbound lane when a vehicle passed him in the eastbound lane and caught his attention as a potential rental vehicle with out-of-state plates. Tr. 21:7-19; 65:8-12. Officer Refsland testified that rental companies tend to use "certain [vehicle] models" and the vehicles themselves have "out-of-state plates, lack of license plate frames, lack of dealer information, lack of customization, stuff like that." Tr. 21:15-19. Officer Refsland testified that although "[n]ot . . . all rental vehicles are tied to criminal activity," rental vehicles are frequently involved with drug trafficking. Tr. 21:22-22:2.

Officer Refsland made a U-turn to get a closer look at the vehicle. Tr. 22:6-13, 21-

23:4. Shortly after Officer Refsland completed the U-turn, the vehicle moved from the far right lane, across another traffic lane, into the left turn lane, and pulled into a gas station.[2] Tr. 22:6-13, 24:3-9; *see* Tr. 23:10-12 ("Yeah, I remember seeing it travel across a couple lanes in order to get into the turn lane; and again, that was right after I had completed my U-turn."). Officer Refsland testified that the vehicle had "ample time to prepare for that turn" and the gas station had been visible for approximately "a quarter mile, if not more." Tr. 63:15-20. Officer Refsland testified that the vehicle's movements felt more "reaction[ary] rather than a pre-planned maneuver." Tr. 24:10-14; *see* Tr. 63:15-22. Officer Refsland testified that, in his experience, this sort of change in driving behavior "tends to be a red flag," and he has observed it in connection "with stuff as simple as driving without a valid license, to drug possession, to people with warrants out for their arrest." Tr. 23:15-19.

### B. At the Gas Station

The vehicle turned into the gas station and "pulled up to the gas pumps." Tr. 24:15-21; *see also* Tr. 64:10-13. The gas station had "a large truck stop parking lot." Tr. 25:18-22. Officer Refsland positioned his squad car "within the parking lot but kind of off near the entrance," "a little ways away" but still visible. Tr. 25:18-25; *see also* Tr. 64:14-17. Officer Refsland testified that, if a traffic violation presented itself, he intended to pull the vehicle over. Tr. 65:19-23, 66:18-23; *see also* Tr. 95:15-22.

Officer Refsland observed a man, later identified as Brtek, exit the driver's seat, and

---

[2] There is no contention that these maneuvers were unlawful or violated any traffic laws. *See* Tr. 23:20-24:1.

a woman, later identified as Camp, exit the passenger's seat.  Tr. 19-25.  Brtek and Camp "did some stuff around the vehicle," and may "have gotten gas or did some things."  Tr. 24:25-25:1.  Then, Brtek and Camp switched places, with Camp driving.  Tr. 25:1-3, 66:8-12.  Officer Refsland testified that people "typically . . . switch drivers . . . in order to continue with their travels," so he expected the vehicle to get back on the road and continue on.  Tr. 25:4-7.

Instead, Camp parked the vehicle "alongside the building away from other vehicles," and she and Brtek reclined their seats back.  Tr. 25:7-10, 66:13-17.  Officer Refsland testified that he figured "they were intending to rest or take a nap or something like that" and "weren't going to be back on the road any time soon."  Tr. 25:9-13; *see* Tr. 26:1-6, 67:11-14.  Officer Refsland found it odd that they had switched drivers before doing so but left the gas station and returned to patrol on Highway 60.  Tr. 25:14-17, 26:1-9, 67:5-14.

### C. Back on the Road & Traffic Violation

After returning to Highway 60, Officer Refsland parked near the interchange with Interstate 90 and monitored traffic.  Tr. 26:10-23, 67:5-10.  He was "a few hundred yards away from the gas station."  Tr. 26:10-17.  Within approximately 15 minutes, the vehicle passed by him.  Tr. 26:18-27:1, 67:22-24.  Officer Refsland testified that, at this point, he "was pretty convinced that [Brtek and Camp] were trying to avoid [him], or any contact with [him] at least."  Tr. 27:8-11.  Camp was driving and smoking a cigarette.  Tr. 27:21-24, 32:18-23.  Officer Refsland observed a second lit cigarette in the back seat, where he had not previously seen anyone.  Tr. 27:23-28:3; *see* Tr. 28:21-29:5.

6

The smoking was significant to Officer Refsland in a number of ways. First, smoking is not allowed in rental vehicles. Tr. 28:4-7. Second, smoking "can be a sign of nervousness." Tr. 28:8-11. Third, smoking can be "utilized as an odor-masking agent" in drug trafficking. Tr. 8:17.

Officer Refsland began traveling behind the vehicle, about 50 to 100 feet behind it. Tr. 29:6-14. The vehicle was in the right, "drive lane," and Officer Refsland was in the left, "passing lane," closest to the median. Tr. 29:16-20, 68:14-19; *see e.g.*, Ex. 1A at 00:00-04. Officer Refsland had followed the vehicle for approximately half a mile when he noticed it drifting within its own lane and, at one point, cross over onto the fog line, "onto the paint." Tr. 29:24, 30:15-18, 31:2-14, 56:13-20, 70:17-21, 89:22-24, 90:3-7; *see* Ex. 1A at 00:05-42. At the time, Officer Refsland was approximately 50 feet behind the vehicle. Tr. 32:4-8, 69:25-70:6. Officer Refsland "watched the tires break the fog line." Tr. 31:17; *see also* Tr. 69:25-70:6. Minnesota law requires vehicles to stay within the lane lines. Tr. 31:18-20, 90:11-16. *See* Minn. Stat. § 169.18, subd. 7 ("When any roadway has been divided into two or more clearly marked lanes for traffic, . . . (1) a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety . . . ."); *see, e.g.*, *Kruse v. Comm'r of Pub. Safety*, 906 N.W.2d 554, 560 (Minn. Ct. App. 2018) (driving onto but not over fog line "could constitute a violation" of Minn. Stat. § 169.18, subd. 7); *see also State v. Davis*, No. A17-1368, 2018 WL 1702073, at *2-3 (Minn. Ct. App. Apr. 9, 2018).

At the time, it was dark. Tr. 29:25-30:4; *see generally* Ex. 1A at 00:00-1:00. There

were no streetlights.  Tr. 30:5-6; *see generally* Ex. 1A at 00:00-1:00.  Officer Refsland's windshield was wet, and the wipers were engaged.  Tr. 30:7-10; Ex. 1A at 00:00-35.  It may have been raining or just finished raining.  Tr. 30:7-14; *see* Tr. 68:20-69:13; *cf.* Ex. 2A at 00:56-1:45 (rain falling when Officer Meinders arrives).  The fog line appears worn in places and is not entirely solid.  Ex. 1A at 00:05-42.  The vehicle was a "larger-sized vehicle," approximately seven feet wide.  Tr. 70:11-16; *see* Tr. 30:23-31:1.  Officer Refsland's squad video shows the vehicle driving very close to the fog line on the right side and, on at least one occasion, traversing onto the area of the fog line.  Ex. 1A at 00:05-42.  The vehicle then gradually moves back towards the middle of the lane.  Ex. 1A at 00:05-42.  At the hearing, Officer Refsland testified that while the squad camera "is good, . . . it certainly can be limited in ways" and the footage captured is not "every bit as good as [his] personal observations . . . during the course of an interaction."  Tr. 86:1-5; *see* Tr. 95:23-96:12 ("in-car dash cams aren't perfect").

**D.  Traffic Stop**

Officer Refsland pulled in behind the vehicle and activated his overhead emergency lights to conduct a traffic stop for the lane violation.  Tr. 31:21-25, 57:24-58:1; Ex. 1A at 00:59.  The vehicle complied by pulling over.  Ex. 1A at 00:59-1:25; *see* Tr. 32:10-14, 72:10-12.

**1.  Initial Encounter**

When Officer Refsland approached, Camp was in the driver's seat and Brtek was "sitting by himself in the back seat."  Tr. 32:22-25.  Brtek was not wearing a seatbelt.  Tr. 33:18-25, 73:9-17, 87:6-15.  Officer Refsland asked Camp if she was okay driving, and she

8

responded that she was resting for "a little while" but just wanted to get home. Ex. 3 at 1:37-45. Officer Refsland told Camp she had been "swerving around a little bit" and was "onto the fog line at one point." Ex. 3 at 1:46-50. Camp responded that she was just trying to make sure that she was staying on the line. Ex. 3 at 1:51-57.

Officer Refsland asked for Camp's license, which she handed to him, and inquired as to the owner of the vehicle. Ex. 3 at 1:58-57; *see also* Tr. 73:6-8. Camp and Brtek responded that it was a rental. Ex. 3 at 2:05-07; *see also* Tr. 58:2-11. Officer Refsland also asked for Brtek's identification, which Camp provided. Ex. 3 at 2:08-11; *see also* Tr. 73:18-23. When Officer Refsland asked where Brtek and Camp were driving to, Brtek responded that they were going back to Minneapolis. Ex. 3 at 2:12-16; *see* Tr. 92:6-23, 93:5-9, 94:4-10 (routinely asks travel-related questions during a traffic stop); *see also* Tr. 34:18-20.

Officer Refsland commented that Brtek had been driving before and Brtek stumbled a bit in response as to why Camp had been unable to drive. Ex. 3 at 2:19-28; *see* Tr. 34:4-10. Camp chimed in that the lights bothered her. Ex. 3 at 2:29-34. Officer Refsland asked where Brtek and Camp were coming from. Ex. 3 at 2:37-40. Brtek responded that they were coming from a funeral in Iowa. Ex. 3 at 2:41-43; *see also* Tr. 34:11-14, 72:18-73:1. When Brtek could not recall where in Iowa the funeral was, Camp said, "Sioux City." Ex. 3 at 2:44-51; *see also* Tr. 34:11-17, 73:2-5. Officer Refsland testified that, in his experience, Sioux City, Iowa, and Minneapolis, Minnesota, are drug-distribution hubs. Tr. 34:21-35:2.

Officer Refsland asked for the rental documentation. Ex. 3 at 2:54-55; *see also* Tr.

58:12-13. Both Brtek and Camp began looking for it. *See* Ex. 3 at 2:56-6:02. Brtek leaned forwarded and opened the glove compartment where Officer Refsland observed a new, unused pipe typically used to smoke marijuana. Tr. 35:10-36:6; *see* Ex. 3 at 3:00-04; *see also* Tr. 58:14-17, 77:2-15, 89:10-16. Brtek handed the pipe over to Officer Refsland when he asked for it. Ex. 3 at 3:04-13; *see also* Tr. 36:7-11. Brtek and Camp denied having any other "weed pipes" in the vehicle. Ex. 3 at 3:37-43. Brtek suggested to Camp that the information might be on her phone and they were ultimately able to locate the rental information on her phone for Officer Refsland to review. Ex. 3 at 3:32-6:02. Officer Refsland asked how long Brtek and Camp were in Iowa and Brtek responded they had been down there "just a couple days." Ex. 3 at 6:03-06. Officer Refsland asked them to "hang tight." Ex. 3 at 6:08-09. Approximately five minutes passed between when Officer Refsland first approached the vehicle and began speaking with Brtek and Camp and when he returned to his squad car to process their information. Ex. 3 at 1:36-6:09. As he was walking back to his squad car, Officer Refsland remarked to himself that the vehicle was "packed full of stuff." Ex. 3 at 6:10-16.

At the hearing, Officer Refsland testified that "Brtek's hands were very obviously shaking non-stop throughout the traffic stop, throughout that initial contact with them." Tr. 37:9-11; *see* Tr. 77:20-22. Officer Refsland further testified that, consistent with his training, he noticed Camp had bruxism, a "clenching or munching on the mouth . . . that[ is] consistent with stimulant drug use." Tr. 37:11-14; *see* Tr. 75:23-76:6, 89:17-21. Officer Refsland acknowledged that this behavior could be associated with other conditions. Tr. 76:11-18. Officer Refsland testified that Brtek and Camp "seemed restless." Tr. 37:15-

17.

Officer Refsland acknowledged that there is often a degree of nervousness by a person subject to a traffic stop.  Tr. 37:18-22; *see* Tr. 74:4-8.  Officer Refsland testified that this nervousness tends to "subside[] as the stop progresses.  After you say, make it clear to them that you're just checking to make sure that they are not drunk or on their phone or something like that, you tend [sic] to give them a warning."  Tr. 37:22-38:1; *see* Tr. 74:9-14.  Officer Refsland testified that persistent nervousness "leads you to wonder what it is that they are nervous about."  Tr. 38:1-3.  Officer Refsland testified that Brtek and Camp's nervousness continued to persist and went beyond what might be anticipated for a normal traffic stop.  Tr. 38:4-5, 88:19-89:4.  Officer Refsland did acknowledge that "at no point in time did [he] tell [Brtek and Camp] that this interaction was going to end quickly."  Tr. 74:15-17.

Officer Refsland additionally testified that he observed a can of air freshener in the vehicle.  Tr. 38:7-10.  Officer Refsland testified that he has seen air freshener "used before during drug[-]trafficking stops . . . to conceal odors."  Tr. 38:11-13.  He found it unusual that air freshener would be needed with a rental "considering they are typically provided to you in pretty good order, there's not much that you should be needing to do to your rental."  Tr. 38:16-18.  Officer Refsland acknowledged that the air freshener could be used to cover up the smell of cigarette smoke.  Tr. 75:17-22.

## 2.  Processing Information

Officer Refsland returned to his squad car and proceeded to run both Brtek and Camp through his computer.  *See, e.g.*, Ex. 3 at 6:11-Tr. 39:8-18.  Around the time Officer

Refsland began running Brtek and Camp through the computer, Officer Meinders came by to see how things were going and Officer Refsland asked him to stay.  Ex. 3 at 6:52-53; Tr. 39:1-7; *see* Tr. 78:18-79:1.  Officer Refsland commented to Officer Meinders that Brtek and Camp had "something going on" and Brtek's hands would "not stop shaking the entire time."  Ex. 3 at 7:24-33; *see* Tr. 79:2-4.  Officer Refsland also commented about the halting nature of their responses, their travel to Sioux City, how there was a "ton of stuff" in the vehicle for a supposedly short trip, and the "weed pipe."  Ex. 3 at 7:34-8:15; *see also* Tr. 55:10-21 ("they had quite a bit of stuff that kind of was – it surpassed what someone typically would bring, I suppose, on just a couple-day trip").  While Officer Refsland was running Brtek and Camp through the computer, Officer Meinders commented that Brtek "can't stop moving."  Ex. 3 at 8:31-33; *see also* Ex. 4 at 1:56-58.  Officer Refsland added that he thought Camp was "high" and "seemed a little restless and amped up."  Ex. 3 at 8:34-41.

Officer Refsland regularly checks criminal histories during a traffic stop.  Tr. 39:8-15.  Among other things, Officer Refsland noted that Brtek's license had been revoked in Minnesota.  Tr. 39:19-25; *see* Tr. 40:3-11.  A check of Camp's criminal history revealed convictions in 2009 for a third-degree drug offense,[3] in 2010 for a first-degree drug offense, and in 2011 for drug-related driving under the influence.  Ex. 3 at 10:00-20; *see* Tr. 39:6-11 (Camp "had some substantial drug convictions in her history"); *see also* Tr. 41:2-15,

---

[3] While Officer Refsland testified that Camp also had a conviction in 2009 for a second-degree drug offense, the second-degree charge "was dismissed in conjunction with [Camp's] plea to the [third-degree charge]."  Gov't's Mem. in Supp. at 7 n.2 (citing *State v. Camp*, No. 65-CR-09-520 (Minn. Dist. Ct.), *available at* http://pa.courts.state.mn.us/CaseDetail.aspx?CaseID=1613284784).

83:12-18.   At the hearing, Officer Refsland acknowledged that these convictions were roughly ten years old.  Tr. 83:19-84:1.  Officer Refsland asked Officer Meinders to watch Brtek while he pulled Camp out of the vehicle and talked with her some more.  Ex. 3 at 10:23-26.  At this point, Officer Refsland testified that he "was pretty suspicious as to what they had going on."  Tr. 41:16-19.  Officer Refsland testified that he next intended to ask for consent to search the vehicle.  Tr. 41:20-22, 83:8-11.  Approximately four minutes passed while Officer Refsland was running Brtek and Camp's information.  Ex. 3 at 6:32-10:24.

### 3.   Brtek & Camp Directed to Exit Vehicle

When he returned to the vehicle, Officer Refsland asked Brtek to get out of the car because he was "being so squirrely," and patted him down.  Ex. 3 at 11:07-46; *see also* Tr. 42:5-11, 78:19-23.  Officer Refsland then had Brtek go stand with Officer Meinders.  Ex. 3 at 11:45-46; *see also* Tr. 42:5-11.  When Officer Refsland approached Camp, she gave him the paper copy of the rental agreement.  Ex. 3 at 11:56-12:30; *see* Tr. 80:24-81:2.  Officer Refsland also asked Camp to step out of the vehicle.  Ex. 3 at 11:56-57; *see also* Tr. 42:5-13, 43:24-44:7.

### 4.   Consent to Search, Beginning of Roadside Search & Discovery of Methamphetamine Residue

Once Camp had gotten out and put her shoes on, Officer Refsland asked if there was anything illegal in the vehicle.  Ex. 3 at 12:03-55; *see also* Tr. 42:5-14; 43:24-44:8, 81:12-21, 82:2-4.  Camp assured him there was not.   Ex. 3 at 12:56-58; *see also* Tr. 42:5-15; 43:24-44:9.  Officer Refsland asked if he could do a "quick search just to make sure of

that" and Camp agreed.  Ex. 3 at 12:59-13:03; *see also* Tr. 42:5-16; 43:24-44:10, 58:22-59:19, 82:5-6.  Camp also confirmed that she was the one who rented the vehicle.  Ex. 3 at 13:04-05; *see also* Tr. 54:17-22.  Officer Refsland likewise asked Camp to stand with Officer Meinders.  Ex. 3 at 13:01-03, 05-06; *see also* Tr. 43:24-44:14.

Officer Refsland then began to search the vehicle.  *See, e.g.*, Ex. 3 at 13:07-20:34.  On the floor of the backseat, Officer Refsland found a crystalline substance that field tested positive for methamphetamine.  Ex. 3 at 20:35-21:11; Tr. 44:22-46:9.  Officer Refsland radioed to Officer Meinders that Brtek and Camp were being detained.  Ex. 3 at 21:00-22; Tr. 46:10-17.

### 5. Handcuffs & *Miranda* Rights

Brtek and Camp were both detained in handcuffs.  *See, e.g.*, Ex. 3 at 21:29-45, 21:53-22:16; Tr. 46:12-17.  Officer Refsland spoke with each of them separately.

Officer Refsland first spoke with Brtek.  *See, e.g.*, Tr. 46:25-47:1.  Officer Refsland advised Brtek that he was not under arrest; read him his *Miranda* rights; asked if he understood those rights; and then asked if he was willing to answer questions.  Ex. 3 at 22:17-46; *see also* Tr. 47:1-8.  Officer Refsland asked Brtek what was "up with the meth shards on the floorboard."  Ex. 3 at 22:47-49; *see also* Tr. 47:9-11.  Brtek subsequently admitted that he and Camp had used methamphetamine a "few days ago" and he had dropped it on the floor.  Ex. 3 at 22:50-23:09; *see* Ex. 3 at 23:22-36; *see also* Tr. 47:12-19.  Officer Refsland asked Brtek "what else is going to be in [the vehicle]," and Brtek told him there was "nothing in there at all right now."  Ex. 3 at 23:10-16; *see also* Ex. 3 at 23:38-41.  Officer Refsland placed Brtek in the back of Officer Meinders's squad car.  Ex. 3 at

23:42-24:07.

Officer Refsland did the same thing with Camp. He advised her that she was not under arrest; read Camp her *Miranda* rights; asked if she understood them; and asked if she was willing to answer questions. Ex. 3 at 24:21-46; *see also* Tr. 47:20-24. Officer Refsland advised Camp that he had found methamphetamine shards on the floorboard and asked her about them. Ex. 3 at 24:47-50; *see also* Tr. 47:25-48:2. Camp subsequently admitted to using methamphetamine either "yesterday" or "the day before yesterday." Ex. 3 at 24:51-25:15; *see also* Tr. 48:3-8. Officer Refsland placed Camp in the back of his squad car. Ex. 3 at 25:44-26:06.

### 6. Continuation of Roadside Search

Officers Refsland and Meiners continued to search the vehicle. *See, e.g.*, Ex. 3 at 26:19-36:56; Ex. 4 at 19:45-34:59; *see also* Tr. 48:14-49:2. Among other things, they found methamphetamine, possible heroin, rubber-banded bundles of cash, and a Tang container with a false bottom containing crystal residue. Tr. 49:10-50:11, 50:23-51:14; *see, e.g.*, Ex. 3 at 27:02-19, Ex. 4 at 20:28-44 (methamphetamine); Ex. 3 at 28:38-47, 29:13-18 (possible heroin); Ex. 3 at 29:53-30:07, Ex. 4 at 23:24-33 (cash); Ex. 3 at 30:49-54, 32:25-44, Ex. 4 at 25:42-26:11 (false-bottom Tang container). Upon further inspection, the brown substance Officer Refsland thought may have been heroin was "psilocybin mushrooms that were just really, really finely crushed." Tr. 50:12-19. Brtek and Camp were both ultimately place under arrest and transported to the Nobles County Jail, and arrangements were made to tow the vehicle. Tr. 53:11-54:2.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned Magistrate Judge makes the following conclusions of law. Brtek and Camp both argue that Officer Refsland (1) lacked the requisite reasonable, articulable suspicion to perform a traffic stop of the vehicle, and (2) improperly extended the scope of the traffic stop.

### A. Traffic Stop

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'" *Heien v. North Carolina*, 574 U.S. 54, 57 (2014); *accord United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012); *see also* U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien*, 574 U.S. at 60; *accord United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020); *Hollins*, 685 F.3d at 705.

> A traffic stop must be supported by reasonable suspicion or probable cause. A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. Any traffic violation, however minor, provides probable cause for a traffic stop.

*Hollins*, 685 F.3d at 706 (quotations and citations omitted); *see also, e.g., Holly*, 983 F.3d at 364 ("It is well established that *any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver.") (quotation omitted); *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) ("A traffic violation, however minor, provides probable cause sufficient to satisfy the constitutional reasonableness requirement.").

16

"Probable cause also exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Holly*, 983 F.3d at 364 (quotation omitted). Thus, "'[e]ven an officer's incomplete initial observations may give reasonable suspicion for a traffic stop,' and '[m]istakes of law or fact, if objectively reasonable, may still justify a valid stop.'" *Id.* (quoting *Hollins*, 685 F.3d at 706) (second alteration in original). "[A] traffic stop comports with the Constitution when the officer reasonably believes that the vehicle has committed a traffic infraction, even if the vehicle did not actually commit such an infraction." *United States v. Miller*, 915 F.3d 1207, 1209 (8th Cir. 2019); *see Holly*, 983 F.3d at 364 ("'To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection.'") (quoting *Heien*, 574 U.S. at 60-61) (internal quotation marks omitted).

"[I]f an officer has reasonable suspicion or probable cause to stop for a traffic violation, 'any ulterior motivation on the officer's part is irrelevant.'" *United States v. McLemore*, 887 F.3d 861, 864 (8th Cir. 2018) (quoting *United States v. Fuehrer*, 844 F.3 767, 772 (8th Cir. 2016)); *see also, e.g.*, *United States v. Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015); *Frasher*, 632 F.3d at 453. The officer's "'[s]ubjective intentions play no role in ordinary probable-cause Fourth Amendment analysis.'" *Gunnell*, 775 F.3d at 1083 (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)); *see also Fuehrer*, 844 F.3d at 772. "Similarly, it is irrelevant that the officer would have ignored the violation but for his ulterior motive." *Frasher*, 632 F.3d at 453; *accord*

17

*Fuehrer*, 844 F.3d at 772; *Gunnell*, 775 F.3d at 1083.

Brtek and Camp each argue that Officer Refsland was mistaken about the purported traffic violation—crossing the fog line—and therefore the stop of the vehicle was unlawful. Brtek asserts that "[t]he squad video does not show any lane violation as described by the officer," and "the officer's testimony places him in a position where it is difficult to imagine he could have seen such a violation." Brtek's Mem. in Supp. at 4-5, ECF No. 78. Camp similarly argues that Officer Refsland's perception of a traffic violation was colored by his "goal of 'disrupting criminal activity'" and generalized suspicion of the vehicle. Camp's Mem. in Supp. at 11, ECF No. 79. According to Camp, "[w]hat we see [on the squad video] is that the fog line, at the apparent time of the breaking, was actually gone—worn completely away by years of use, and there did not appear to be any weaving back and forth in the lane." Camp's Mem. in Supp. at 12. Camp argues that Officer Refsland's slanted frame of reference combined with his wet windshield, angle of view, and simultaneous concentration on his own driving led him to perceive a traffic violation that is not born out by his squad video.

The Court finds credible Officer Refsland's testimony that the vehicle improperly crossed into the area of the fog line, thereby committing a traffic violation under Minnesota law. It is true that the squad video does not conclusively show the vehicle's tires on the paint of the fog line. *See State v. Camp*, No. 53-CR-20-300, slip op. at 10 (Minn. Dist. Ct. July 7, 2020) ("[A]lthough[] a review of [the squad video] does not reveal to the Court that the vehicle crossed over the line, it is possible that the vehicle drove on the line. The viewing angle of the squad camera combined with rain and darkness make it difficult to

conclude with certainty that the vehicle engaged in any line-crossing, however, it cannot be ruled out either."), ECF No. 80-1.[4]

But, it is also true that the video is not inconsistent with Officer Refsland's testimony that the vehicle crossed into the area of the fog line. *See Holly*, 983 F.3d at 364 ("[T]here is no extrinsic evidence that clearly contradicts the officers' account, nor was the officers' testimony so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it.") (quotation omitted).  The vehicle was driving close to the fog line and, on at least one occasion, traversed into the area of the fog line.   Camp's own statements indicate she was trying to remain on the line.  Officer Refsland had the best view of the events in question.  *See Camp*, slip op. at 11 ("While this Court agrees that the video footage is not conclusive in light of the rain and darkness[, Officer] Refsland had a better view than the Court, which could not rule out the possibility that the vehicle made contact with the fog line.").  Further, even assuming for sake of argument that Brtek and Camp are correct and the vehicle did not *technically* break the fog line, Officer Refsland's belief that it did was at minimum reasonable under the circumstances given the vehicle's movement, the erosion of the painted line, and commonsense deduction.  *See Holly*, 983 F.3d at 364; *Miller*, 915 F.3d at 1209; *Hollins*, 685 F.3d at 706.

Because Officer Refsland's testimony was credible and his belief that the vehicle violated Minnesota traffic laws by crossing onto the area of the fog line was objectively reasonable, Officer Refsland had probable cause for the traffic stop.  *See Holly*, 983 F.3d

---

[4] State charges preceded the federal charges in this case. Gov't Mem. in Opp'n at 10.  *See generally State v. Camp*, No. 53-CR-20-300 (Minn. Dist. Ct.) (Fifth Judicial District, Nobles County).  The state district court issued an order denying Camp's motion to suppress in that case based on the events in question on July 7, 2020.

at 364; *Miller*, 915 F.3d at 1209; *Hollins*, 685 F.3d at 706. And, because the traffic stop was supported by probable cause, Officer Refsland's subjective motivations for the stop are irrelevant. *See Whren*, 517 U.S. at 813; *McLemore*, 887 F.3d at 864; *Frasher*, 632 F.3d at 453.

## B. Extension of the Stop

Brtek and Camp next argue that even if the traffic stop were valid, Officer Refsland impermissibly extended the scope of the stop without a sufficient basis to do so.

"[A] constitutionally permissible traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete its purpose." *Hollins*, 685 F.3d at 706 (quotation omitted); *see, e.g.*, *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020); *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir.), *cert. denied*, ___ S. Ct. ____, 2020 WL 7132622 (2020); *see also Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted); *see, e.g.*, *Soderman*, 983 F.3d at 374 ("An officer may lawfully continue a traffic stop until 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'") (quoting *Rodriguez*, 575 U.S. at 354).

"After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (quoting *United States v. Barragan*, 379 F.3d 524, 528 (8th

Cir. 2004)).  "These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning." *Id.*; *accord Fuehrer*, 844 F.3d at 772; *United States v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015); *see also Rodriguez*, 575 U.S. at 355-56.  An officer may also ask travel-related questions.  *See, e.g.*, *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018) (destination and purpose); *Quintero-Felix*, 714 F.3d at 567 (itinerary); *United States v. Williams*, 431 F.3d 296, 298 (8th Cir. 2005) (per curiam) (destination, route, and purpose); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (destination and purpose). "The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 354 (quotation omitted).

"[O]nce an officer finishes these tasks, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention . . . ." *Quintero-Felix*, 714 F.3d at 567 (quotation omitted); *accord Fuehrer*, 844 F.3d at 772-73; *see also Rodriguez*, 575 U.S. at 354.  "[I]f the response of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Jones*, 269 F.3d 919, 926-27 (8th Cir. 2001) (quotation omitted); *see Anguiano*, 795 F.3d at 876 ("[I]f the investigating officer discovers information leading to reasonable suspicion, he may justifiably extend the stop.").  "Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot does he have justification for a greater intrusion unrelated to the traffic offense." *Jones*, 269 F.3d at 927 (quotation omitted);

21

*accord Bloomfield*, 40 F.3d at 918 ("If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense.") (quotation and footnote omitted).

Reasonable suspicion "requires that the officer's suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Jones*, 269 F.3d at 927 (quotation omitted); *see also Sanchez*, 955 F.3d at 674 ("The reasonable suspicion inquiry asks whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.") (quotation omitted). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (quotation omitted); *see also United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) ("A reasonable suspicion is some minimal, objective justification for suspicion beyond an inchoate hunch.") (quotation omitted).

> In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone. Furthermore, the court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity.

*Jones*, 269 F.3d at 927 (citation omitted); *accord Bloomfield*, 40 F.3d at 918. Courts "evaluate whether police had reasonable suspicion to extend a traffic stop based on the totality of the circumstances." *Davis*, 943 F.3d at 1132; *see Sanchez*, 955 F.3d at 674-75.

Brtek argues that Officer Refsland "immediately began asking questions related to

a narcotics investigation," Brtek's Mem. in Supp. at 5, including their travel plans and whether the vehicle was a rental, questions which Brtek contends were not related to the original purpose of the traffic stop. Camp similarly argues that Officer Refsland "extended [the scope of the traffic stop] to run . . . [their] criminal histories through Minnesota's public criminal history database." Camp's Mem. in Supp. at 17-18. But as stated above and pointed out by the Government, questions regarding travel plans and registration of the subject vehicle are permissible. *See, e.g.*, *Espinoza*, 885 F.3d at 523; *Fuehrer*, 844 F.3d at 772; *Anguiano*, 795 F.3d at 876; *Quintero-Felix*, 714 F.3d at 567; *see also Rodriguez*, 575 U.S. at 355-56. So too is a criminal-history check. *Fuehrer*, 844 F.3d at 772; *Anguiano*, 795 F.3d at 876; *Quintero-Felix*, 714 F.3d at 567; *see also Rodriguez*, 575 U.S. at 355-56.

Camp latches onto Officer Refsland's testimony that she and Brtek appeared more nervous than persons subject to a traffic stop might ordinarily be and, unlike those situations in which nervousness diminishes with the reassurance of a written warning, no such reassurance was given here. While "nervousness combined with several other more revealing facts can generate reasonable suspicion," general "nervousness is of limited significance." *Jones*, 269 F.3d at 928 (quotation omitted). It is not "unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." *Id.* at 929 (quotation omitted); *accord Bloomfield*, 40 F.3d at 918 (noting "it is customary for people to be 'somewhat nervous' when [law enforcement] pulls them over"). The Court need not focus on whether Brtek and Camp exhibited an unusual degree of nervousness because, for the reasons that follow, any nervousness was only one of several circumstances that combined to form reasonable suspicion that criminal activity was afoot.

23

Here, the totality of the circumstances encompassed things that occurred both before and during the traffic stop. Prior to the traffic stop, Officer Refsland observed a vehicle with out-of-state plates whose other characteristics suggested it might be a rental. Based on his training and experience, rental vehicles are often used in drug trafficking. The vehicle was traveling in the early morning hours while a Stay-at-Home Order was in effect. Shortly after Officer Refsland completed a U-turn to follow the vehicle, it made a reactionary turn into a gas station. *See United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008) ("While the officer's subjective perceptions of the driver's nervous behavior or evasive driving alone may not be sufficient to constitute a reasonable, articulable suspicion, when taken with other factors, they contribute to the suspicion."); *United States v. Lara*, No. 06-cr-315-09 (DSD/FLN), 2007 WL 3144998, at *5 (D. Minn. Oct. 24, 2007) (driver's widened eyes and quick exit from highway upon spotting officer contributed to reasonable suspicion). And, after refueling and switching drivers, the vehicle parked—and the occupants reclined as if to rest—but was back on the road approximately 15 minutes after Officer Refsland left the gas station.

By the time Officer Refsland returned to his squad car to complete the tasks associated with the traffic violation, he had (1) confirmed the vehicle was a rental; (2) observed Brtek and Camp's demeanors, noting nervousness (shaky hands and restlessness) and a physical manifestation of stimulant use (bruxism); (3) observed a pipe typically used to smoke marijuana; (4) observed the presence of at least one odor-masking agent (air freshener); (5) learned that Brtek and Camp were travelling between two drug-distribution hubs; and (6) observed a large amount of stuff in the vehicle, which was inconsistent with

24

Brtek and Camp's reported travel plans of a few days' trip. While completing routine tasks related to the traffic violation, Officer Refsland additionally learned that Camp had a significant albeit dated history of drug offenses. *See, e.g.*, *Riley*, 684 F.3d at 763-64 (criminal history related to drugs contributed to reasonable suspicion). Moreover, Brtek continued to move about in the vehicle, unable to remain still. Collectively, these observations and the earlier events, combined with Officer Refsland's training and experience in drug interdiction, formed reasonable articulable suspicion that criminal activity was afoot no later than the point at which Officer Refsland completed the routine checks of Brtek and Camp's information in connection with the traffic stop.

Brtek and Camp argue that use of a rental vehicle, visiting Sioux City, and nervousness around law enforcement could just as well be associated with innocent conduct. This may be true. But, "factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011); *see United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) ("Though each factor giving rise to suspicion might appear innocent when viewed alone, a combination of factors may warrant further investigation when viewed together."). Moreover, "'[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.'" *Sanchez*, 955 F.3d at 675 (alteration in original) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Thus, while any one of these circumstances individually might not be sufficient to create reasonable suspicion, their collective presence in combination with Officer Refsland's training and experience and the

earlier events warranted further investigation.  *See Stewart*, 631 F.3d at 457; *Linkous*, 285 F.3d at 720.

Brtek and Camp additionally argue that asking them to exit the vehicle and seeking consent to search the vehicle impermissibly extended the scope of the traffic stop.  Each of these things, however, occurred *after* Officer Refsland had a particularized and objective basis for suspecting they were engaged in criminal activity.  In any event, an officer may order the driver and passengers of a vehicle to exit pending the completion of a traffic stop.  *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (passengers); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam) (driver); *see also Arizona v. Johnson*, 555 U.S. 323, 330-32 (2009).  Moreover, "[a]sking for consent to search does not violate the Fourth Amendment in the absence of coercive or otherwise unusual circumstances." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); *accord Riley*, 684 F.3d at 764.  Neither Brtek nor Camp contends such circumstances were present here and the Court's review of the video from Officer Refsland's body-worn camera when he makes the request dispels the existence of any such circumstances.

In sum, the Court concludes that, under the totality of the circumstances and based on Officer Refsland's training and experience, Officer Refsland had reasonable suspicion to believe Brtek and Camp were involved in criminal activity no later than the point at which he completed the routine checks of their information in connection with the traffic stop.  Officer Refsland was therefore justified in extending the duration of the traffic stop to investigate his suspicions.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Brtek's Motion to Suppress Tangible Evidence & Statements Due to Fourth Amendment Violations, ECF No. 33, be **DENIED**.

2. Camp's Motion to Suppress Statements, Admissions and Answers, ECF No. 54, be **DENIED**.

3. Camp's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 55, be **DENIED**.

Date: January__20__, 2021                                        _____*s/ Tony N. Leung*_____
                                                                                    Tony N. Leung
                                                                                    United States Magistrate Judge
                                                                                    District of Minnesota

                                                                                    *United States v. Brtek et al.*
                                                                                    Case No. 20-cr-79 (DWF/TNL)

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.

27